IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

*Electronically Filed*

| | | |
|---|---|---|
| **ELLA M. HIX,**<br>**7513 Harshmanville Rd**<br>**Huber Heights, OH 45424** | ) <br> ) <br> ) <br> ) | |
| **PLAINTIFF,** | ) <br> ) | **CASE NO. _____** |
| | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | |
| **v.** | ) <br> ) | |
| **DAYTON CHILDREN'S**<br>**HOSPITAL,** | ) <br> ) | **COMPLAINT** |
| **One Children's Plaza**<br>**Dayton, OH 45404**<br>**Serve:** | ) <br> ) <br> ) | **WITH JURY DEMAND** |
| **Dayton Children's Hospital**<br>**c/o Acme Agent, Inc.**<br>**41 South High Street Suite 2800**<br>**Columbus, OH 43215** | ) <br> ) <br> ) <br> ) <br> ) | |
| **DEFENDANT** | ) | |

**COMPLAINT**

For her complaint against the Defendant Dayton Children's Hospital, Plaintiff Ella Hix

alleges and avers as follows:

1. Throughout the COVID-19 pandemic, the Plaintiff, Ella Hix

1

stood ready, willing, and able to take safety precautions in the workplace as required by her past employer to prevent the spread of COVID-19 and protect her health and the health of those employees with whom she worked. The Plaintiff, however, has a religious belief that conflicts with one of her past employer's safety policies: mandatory vaccination. The Plaintiff's conflict is protected by federal and state law. Thus, this case is not a challenge to the lawfulness of the policy imposed by the Defendant, but rather an attempt to prevent unlawful discrimination based on religion in the future and to hold her past employer accountable for the harm she has suffered at its hands.

2. Federal and state law recognize an employee has a right to have religious beliefs considered when those beliefs conflict with an employer's policies, and, when possible, accommodated. The Defendant Dayton Children's Hospital ignored federal and state law and instead applied its own set of rules when it comes to religious accommodations and exemptions to its mandatory COVID-19 vaccination policy. Defendant then wrongfully denied Plaintiff's request by arbitrarily determining the veracity of Ms. Hix's sincere religious beliefs. This was done in violation of Defendant's obligations under Title VII of the Civil Rights Act of 1964 ("Title VII") and Section 4112.02 of the Ohio Revised Code ("O.R.C. § 4112.02").

3. Defendant's actions left Ms. Hix's with the impossible choice of either taking the COVID-19 vaccine, at the expense of her religious beliefs, or losing her livelihood.

4. Under Title VII and Ohio law, if an employee seeks a religious accommodation, their employers cannot summarily impose employer-preferred workplace rules that abridge an employee's sincerely held religious beliefs without genuine, good-faith dialogue and consideration of proposed accommodations with objective evidence, and, if the employer chooses to deny an employee accommodations, proof that allowing the accommodations would

2

place an undue burden on the employer. Dayton Children's Hospital's behavior was in violation of these laws.

## PARTIES

5. The Plaintiff, Ella Hix, ("Plaintiff" or "Ms. Hix") is a resident of Dayton, Ohio. The Plaintiff has been employed by the Defendant Dayton Children's Hospital ("Defendant") for over 26 years. The Plaintiff has a sincere religious belief that taking a COVID-19 vaccine violates her religious beliefs. The Plaintiff requested a religious accommodation from the Defendant's vaccine mandate policy ("vaccine mandate"), presented on August 5, 2021 (attached hereto as Exhibit A) which required all employees to receive a COVID-19 vaccination. Defendant stated in her Covid-19 religious exemption form (attached hereto as Exhibit B) and referred to as "the exemption form" going forward, that "[a[ religious exemption to COVID-19 immunization may be granted based on an individual's sincerely held religious belief, practice or observation that prohibits COVID-19 vaccination." The Plaintiff followed all the Defendant's procedures to apply for a religious exemption to the Defendant's vaccine mandate to which she was legally entitled, and the Defendant wrongfully and improperly denied the Plaintiff's request and terminated her employment in violation of the Defendant's own stated policy, as memorialized in the exemption form. In the exemption form, the Defendant's policy tracks EEOC guidelines on the granting of religious exemptions, however, the Defendant clearly applied their own undefined religious criteria in evaluating Ms. Hix's sincerely held religious beliefs. Ms. Hix was informed of the denial of her religious exemption request in the Nov. 1, 2021 letter making the improper termination was effective on November 30, 2021. The conclusory explanation that was given, and not supported by any additional documentation, was

3

that her request was "not accepted as a valid basis for exemption from the Dayton Children's vaccine requirement." (attached hereto as Exhibit C)

6. The Defendant is incorporated in the State of Ohio, with its principal place of business at One Children's Plaza, Dayton, Ohio 45404. Actual direction, control and coordination of the Defendant's business occurs in Dayton, Ohio.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over the parties pursuant to 28 U.S.C. § 1331 because the Complaint seeks relief and damages under federal statute, 42 U.S.C. § 2000e, *et seq.,* and has supplemental jurisdiction over the Plaintiff's state law claim arising from the same events and occurrences under O.R.C. § 4112.02 pursuant to 42 U.S.C. § 1367.

8. Venue is proper in this district pursuant to U.S.C. § 1391(b) because the relevant events took place in Dayton, Ohio, which is in the Southern District of Ohio, Western Division and the Defendant's principal place of business is located therein.

9. The Court has personal jurisdiction over the Defendant because the Defendant resides and conducts business in this judicial circuit.

10. Plaintiff's claims for attorney's fees and costs are predicated upon Title VII, 42 U.S.C. § 2000e-5, and as allowed under state law.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

11. On or about January 9, 2022, Plaintiff timely filed charges of religious discrimination with the Ohio Civil Rights Commission (OCRC) which has a dual filing agreement with the federal Equal Employment Opportunity Commission ("EEOC").

12.     Her Notice of Right to Sue was issued on May 20, 2022. Attached hereto as Exhibit D.

13. This Complaint is being timely filed based on the date Plaintiff received her Notice to Right to Sue.

14. All administrative prerequisites to the filing of this suit have been meet.

## ALLEGATIONS

15.     In March 2020, American life was irreparably changed both by COVID-19 and by various governments and employers' response to it. COVID-19 is a virus that was first detected in Wuhan, China, and eventually made its way to the United States of America, setting off a chain of events that has irretrievably changed the day-to-day life of many, if not most, Americans.

16.     In the spring of 2020, the Defendant began implementing procedures for its workforce, including several of the following requirements for its employees: masks, social distancing, temperature checks, COVID-19 testing, and self-quarantine. Upon information and belief, the Defendant had substantial success reducing the risk of COVID-19 spread through these efforts.

17.     Despite the Defendant's success in controlling the spread of COVID-19 in its workspace, the Defendant chose to implement a blanket vaccine mandate, based on reasoning unsupported by science, and has improperly implemented its vaccine mandate in violation of Title VII and O.R.C. § 4112.02.

18.     Furthermore, the Defendant improperly terminated the Plaintiff for

5

refusing to comply with one of its safety procedures – mandated vaccination – which has limited results in preventing the transmission of disease in the workplace, ignores natural immunity, and improperly assesses risk.

**The Defendant pivoted from successful and proven COVID-19 mitigation practices and improperly chose mandated vaccination as its sole safety procedure upon which it predicated employment.**

A. The vaccine mandate is unlawful as enforced.

19. The Food and Drug Administration ("FDA") issued an Emergency Use Authorization ("EUA") for the Pfizer-BioNTech vaccine on December 1, 2020 for select populations. One week later a second EUA for the Moderna COVID-19 vaccine was issued. The FDA issued an EUA for the Johnson & Johnson COVID-19 vaccine on February 27, 2021. On August 23, 2021, the FDA issued full approval for the Pfizer-BioNTech COVID-19 vaccine marketed as Comirnaty. However, it should be noted, that the FDA has admitted the Comirnaty vaccine, which is legally distinct from the Pfizer vaccine that is currently available in the US, has never been available in the US.

20. Though the FDA has approved the use of a currently unavailable vaccine for future use, the only vaccines widely available for use in the United States are these three experimental, investigative and unlicensed drugs, all of which were either developed, tested, or produced with the use of fetal cells from aborted fetuses.

21. Since the rollout of the vaccines, more and more data increasingly show the vaccines do not prevent infection, do not prevent transmission, and do not prevent illness. Indeed, countries with the most aggressive, expansive use of the vaccines have seen record-setting infection rates and continuing high illness rates.

22. Scientists studying over 4,000 frontline workers found that between

December 2020 until April 2021, the effectiveness of the vaccines cratered from 91 percent to 66 percent. This drastic decline occurred before the Delta and Omicron variants became dominant variants.[1]

23.     Even more alarming, research focusing on the Pfizer vaccine's effectiveness in America shows that from December 14, 2020, until August 8, 2021, the vaccine plummeted in effectiveness, collapsing from 88 percent to 47 percent.[2]

24.     In addition, governmental authorities have revised their definition of the word "vaccine" itself in order to continue to label these experimental drugs with novel ingredients "vaccines" because they fail to meet the test of traditionally defined vaccines, which actually inoculated against infection and prevented transmission, neither of which these vaccines can any longer claim credit for – this reflects the fact there has never been a successful COVID-19 vaccine in history due to the viral evolution each virus mutates into.[3]

B.    The vaccine mandate ignores natural immunity.

25.     The National Institutes of Health and other bodies have found that natural immunity to COVID-19 – that is, immunity cause by infection with COVID-19 and recovery – is incredibly strong. Specifically, antibodies against the spike protein of the COVID-19 virus remain in 98% of people who have recovered from the virus six to eight months after infection

---

[1] Ashely Fowlkes, et al., *Effectiveness of COVID-19 Vaccines in Preventing SARS-CoV-2 Infection Among Frontline Workers Before and During B.1.617.2 (Delta) Variant Predominance – Eight U.S. Locations, December 2020-August 2021,* 70 Morbidity and Mortality Weekly Report (Aug. 27, 2021) available at https://www.cdc.gov/mmwr/volumes/70/wr/mm7034e4.com.
[2] Sara Y. Tartof, et al., *Six-month Effectiveness of BNT162b2mRNA COVID-19 Vaccine in a Large US Integrated Health System: A Retrospective Cohost Study,* Lancet, 2021 Oct. 16, 398 (10309):1407-16, available at https://pubmed.ncbi.nlm.nih.gov/34619098/.
[3] Katie Carrero, *Why did the CDC change its definition for 'vaccine'? Agency explains more as skeptics lurk,* MIAMI HERALD (Sept. 27, 2021) available at https://wwww.miamiherald.com/news/coronavirus/artcle254111268.html.

(and the outer limit of the study was simply because the study was done on individuals where were six to eight months out of recovery, not because immunity begins to wear off).[4]

26.     Health and Human Services' Assistant Secretary, Dr. Admiral Brett Giroir stated in August 2021, in a nationally televised interview, that "there are still no data to suggest vaccine immunity is better than natural immunity. I think both are highly protective." [5]

27.     The data out of the State of Israel underscores this point. In a paper awaiting peer review, scientists out the State of Israel report that in studying thousands of patients, those whose only source of immunity was a vaccine (in the case of Israel, the Pfizer vaccine was used) had a 5.96 to 13.06-fold increased risk of a breakthrough infection with the Delta variant of COVID-19 over those whose immunity was natural.[6]

28.     Israel is one of the most vaccinated places in the world, with close to 80% of the country having been vaccinated. Israel's bout with the Delta variant of COVID-19 has demonstrated that the Pfizer vaccine, once considered the Cadillac of the three COVID-19 vaccines, is only 64% effective at preventing symptomatic cases of COVID-19.[7] Moreover, despite Israel's high vaccination rates, Israel is becoming "the world's COVID hotspot."[8]

---

[4] NIH, *Lasting immunity found after recovery from COVID-19*, NIH (Jan. 26, 2021), available at https://www.nih.gov/news-events/nih-research-matters/lasting-immunity-found-after-recovery-covid-19.

[5] FOX NEWS, *Admiral Brett Giroir explains natural immunity to COVID-19*, Admiral Brett Giroir (Aug. 13, 2021) available at https://www.youtube.com/watch?v=O641EW4okPs.
[6] Sivan Gazit, et al., *Comparing SARS-CoV-2 Natural Immunity to Vaccine -Induced Immunity: Reinfections Versus Breakthrough Infections*, medRvix (Aug. 25, 2021), available at https://www.medrxiv.org/content/10.1101/2021.08.24.21262415v1.full.pdf.
[7] Aaron Blake, *Vaccine doubters' strange fixation with Israel*, WASHINGTON POST (Jul. 22, 2021) available at https://www.washingtonpost.com/politics/2021/07/19/vaccine-skeptics-zero-israel-again-some-reasons/.
[8] Conor Boyd, *Israel is not the world's Covid hot spot: Cases sours despite country's trail blazing vaccine roll-out – sparking fears other highly-vaccinated countries will be hit by another wave due to jabs' waning immunity*, DAILY MAIL (Sept. 3, 2021) available at

29. In addition, in a recent study concerning the Omicron variant, scientists found that the variant "can evade immunity from COVID-19 more so than any other previous variants discovered during the course of the pandemic."[9] "Researchers studied over 11,000 Danish households and found that those who had the Omicron variant had a 31 percent chance of a secondary attack rate (SAR), which refers to the probability an infection occurs within a specific group like a household or close contacts."[10] Moreover, the study revealed that "vaccine effectiveness was reduced to around 40 percent against symptoms and to 80 percent against severe disease. . ."[11]

30. The now well-known study of the effects of natural immunity in the Cleveland Clinic Health System provides yet another example of the real-world superiority of natural immunity to vaccine immunity. That study compared "breakthrough infections" (re-infection after either contracting COVID-19 or taking a vaccine) among employees of the Cleveland Clinic Health System and found that those who were previously infected and unvaccinated, 1359 people, none suffered breakthrough infections. [12]

31. Another newly published study found that there is "no discernible

---

https://dailymail.co.uk/news/article-9951117/Isreal-worlds-covid-hotspot-0-2-population-catching-yesterday.html.

[9] Shirin Ali, New study finds omicron variant better at evading immunity, THE HILL (Jan. 3, 2021) available at https://thehill.com/changing-america/well-being/prevention-cures/588040-new-study-finds-omicron-variant-better-at citing and referencing https://www.medrxiv.org/content/10.1101/2021.12.27.21268278v1.

[10] Id.

[11] Id.

[12] Nabin K. Shrestha, et al., Necessity of COVID-19 Vaccine in Previously Infected Individuals, medRxiv (Jun. 19, 2021), available at https://www.medrxiv.org/content/10.1101/2021.06.01.21258176v3.

9

relationship between percentage of population fully vaccinated and new COVID-19 cases in the last [seven] days."[13] The study found to the contrary that there was a "marginally positive association such that countries with higher percentage of population fully vaccinated have higher COVID-19 cases per [one] million people." [14] That study, which analyzed 68 different countries' vaccination rates and the rate of new COVID-19 cases, specifically referred to Israel, Portugal and Iceland, each of which is highly vaccinated and which had more cases per one million people than, for example, Vietnam and South Africa, which had around ten percent of their population fully vaccinated.[15]

32.  Several scholarly journals have also weighed in on the superiority of natural immunity to vaccine immunity. [16] Further, those who previously were infected with COVID-19 were at greater risk for bad side effects associated with the vaccine - in such cases, the vaccine might even weaken their pre-existing immunity.[17]

33.  While the vaccines have been effective at preventing serious cases and deaths, they lag far behind natural immunity in preventing symptomatic cases of COVID-10, and, therefore, transmission of COVID-19.

C.  The vaccine mandate relies on an improper assumption about the infection-fatality rate and asymptomatic spread.

---

[13] S.V. Subramanian and Aknil Kumar, Increases in COVID-19 are Unrelated to Levels of Vaccination Across 68 Countries and 2947 Counties in the United States, Eur J Epidemiol 2021 Sep 30:1-4, https://doi.org/10.1007/s10654-021-00808-7.

[14] Id.

[15] See id.

[16] Jackson S. Turner, et al., SARS-CoV-2 Infection Indicates Long-lived Bone Marrow Plasma Cells in Humans, Nature, 595, 421-25 (May 24, 2021), available at https://www.nature.com/articles/s41586-021-03647-4.

[17] Carmen Camara, et al., Differential Effects of the Second SARS-CoV-2 mRNA Vaccine Dose on T Cell Immunity in Naïve and COVID-19 Recovered Individuals, bioRxiv (Mar. 22, 2021) https://doi.org/10.1101/2021.03.22.436441, available at https://www.biorxiv.org/content/10.1101/2021.03.22.436441v1.

34.    COVID-19 presents a risk primarily to individuals aged 85 or older[18] and those with comorbidities such as hypertension and diabetes.[19]

35.    The majority of deaths associated with COVID-19 occur in those over the age of 55.[20] Within the most heavily impacted age group (age 85 and up), only 13.3% of deaths from February 2020 to February 2021 were attributed to COVID-19.[21]

36.    One of the most useful measures for calculating the risk of dying from a virus is the infection-fatality rate ("IFR"). The IFR is calculated by dividing the number of COVID-19 deaths by the number of COVID-19 infections. It attempts to answer the critical question: "If I get sick, what is the chance that I will die?" The Center for Disease Control and Prevention ("CDC") estimates the IFR for the bulk of most working-age adults is exceedingly low.[22] For adults under age 50, the CDC's "current-best estimate" is that 500 people will die per 1,000,000 infections nationwide.[23] In other words, for every one million adults infected age 50 or younger, 999,500 of them will survive COVID-10.[24]

37.    Assuming the data regarding COVID-19 infections is accurate, the

---

[18] Mayo Clinic, *COVID-19: who's at higher risk of serious symptoms* (Jan. 22, 2022) available at: https://www.mayoclinic.org/diseases-conditions.

[19] Wren Hann, et al., *Comorbidities in SARS-CoV-2 Patients: a Systematic Review and Meta-Analysis*, ASM Journals/mBio/Vol.12, No. 1 (Feb.9, 2021) https://doi.org/10.1128/mBio.03647-20, available at https://journals.asm.org/doi/10.1128/mbio.03647-20?permantly+true&.

[20] *Id.*

[21] Heritage Foundation, *COVID-19 Deaths by age* (Feb. 17, 2021) available at https://datavisualizations.heritage.org/public-health/covid-19-deaths-by-age/.

[22] CDC, *COVID-19 Pandemic Panning Scenarios,* Centers for Disease Control and Prevention (Mar. 19, 2021) available at https://www.cdc.gov/oronavirus/2019-ncov/hcp/planning-scenerios.html.

[23] *Id.*

[24] *Id.*

CDC's numbers show Americans across the board are far more likely to die of something other than COVID-19, which casts considerable doubt on the Defendant's assertions that all employees should be vaccinated due to business necessity.[25]

38.     The Defendant already employs a very successful method of preventing COVID-19 spread from the symptomatic – self-quarantine. The Defendant's vaccine mandate only addresses one risk: asymptomatic lethal spread. The problem with the Defendant's mandate is two-fold: first, asymptomatic lethal spread is significantly less of a threat than the Defendant seems to assert,[26] and second, testing more effectively, and easily, suffices rather than forced injections of unwanted experimental, potentially life-altering drugs developed in ways that offend the Plaintiff's religious beliefs or discriminates against her because of her sincerely held religious beliefs.

39.     The Defendant uses the specter of "asymptomatic spread" – the notion that fundamentally healthy people could transmit COVID-19 to others without having any symptoms of COVID-19 – to justify its vaccine mandate. But there is little credible scientific

---

[25] Smiriti Mallapaty, *The Coronavirus Is Most Deadly If You Are Older and Male,* NATURE (Aug. 28, 2020) (demonstrating that individuals under 50 face a negligible threat of a severe medical outcome from a coronavirus infection, akin to the types of risk that most people take in everyday life, such as driving a car) available at https://www.nature.com/articles/d41586-020-02483-2.

[26] Michael A. Johansson, et al., *SARS-CoV-2 Transmission from People Without COVID-19 Symptoms,* JAMA Netw. Open, 2021; 4(1):e2035057 (Jan. 7, 2021) http://doi.10.1001/Jamanetworkopen.202.35057, available at https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2774707. *See also* Kenneth McIntosh, et al., *COVID-19: Epidemiology, Virology, and Prevention,* WoltersKluner (Jan. 13, 2022) available at https://www.uptodate.com/contents/covid-19-epidemiology-virology-and-prevention#H3392906512.

evidence that demonstrates the phenomenon of "asymptomatic spread" poses any meaningful danger to employees or anyone else for that matter. Indeed, it is "very rare" even according to Anthony Fauci, and, at worst, poses a one-in-a-million risk of lethal spread. The Defendant's response to COVID-19 is predicated, in part, on the flawed assumption that asymptomatic individuals pose a meaningful risk of spreading disease.

40.     Evidence of transmission requires that an individual can be shown to be the source of infection for another person who then developed symptoms of a disease/illness.

41.     Basic microbiology shows that infectiousness or transmission of viruses such as COVID-19 require an active infection resulting in elevated levels of viral replication in the host and shedding of the virus.[27]

42.     Decades of research demonstrates that symptomatic people, such as those coughing, sneezing, and wheezing, are the real drivers of viral spread, a fact Dr. Anthony Fauci initially acknowledged during the early days of the pandemic when he told the press, "[E]ven if there is some asymptomatic transmission, in all the history of respiratory-born viruses of any type, asymptomatic transmission has never been the driver of outbreaks. The driver is always a symptomatic person." [28]

43.     When the viral replication process is blocked by a healthy immune

---

[27] *See generally*, Samuel Baron, et al., *Medical Microbiology* (4th ed. 1996) available at: https://www.ncbi.nlm.nih.gov/books/NBK8149/. *See also* Hitoshi Kawasuji, et al., *Transmissibility of COVID-19 depends on the viral load around onset in adult and symptomatic patients*, PLOS ONE (Dec. 9, 2020) available at https://journals/plos.org/plosone/article?id=10.1371/journal.pone.0243597.

[28] U.S. Department of Health and Human Services, *Update on the New Coronavirus Outbreak First Identified in Wuhan, China*, Press Briefing (Jan. 28, 2020) available at https://www.youtube.com/watch?v=w6koHkBCoNQ&t=2642s

system, the virus is neutralized, preventing significant viral replication and shedding. This occurs in approximately half the people exposed to the virus. Their immune system's defenses effectively ward off COVID-19 before it can take hold and cause symptomatic disease. Research demonstrated that asymptomatic people are not the drivers of COVID-19 transmission as demonstrated in the following points.

44. Researchers studying real-world laboratory samples of more than a quarter-million people found that even with a positive RT-PCR test, asymptomatic people have a much lower probability of being infectious.[29]

45. A research article published in the CDC's *Emerging Infectious Diseases* journal notes that little to no transmission of COVID-19 occurred from asymptomatic people studied by research in Germany.[30] The researchers note: "The fact that we did not detect any laboratory-confirmed SARS-CoV-2 transmission from asymptomatic case-patients is in line with multiple studies . . ."[31] The lack of scientific and medical evidence surrounding asymptomatic spread led the researchers to conclude that asymptomatic spread is "unlikely to substantially spread COVID-19.[32]

46. A review in March 2021 of all the published meta-analysis on asymptomatic transmission from Dr. John Lee, a retired British Professor of Pathology, reveals that in many cases, the same few studies have been recycled repeatedly to support the flawed

[29] Andreas Stang, *The performance of the SARS-CoV-2-RT-PCR test as a tool for detecting SARS-CoV-2 infection in the population* (Aug. 2021) 83 J. Infect. 2, https://doi:10.1016]j.jinf.2021.05.022  available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8166461/.
[3030] Jennifer K. Bender, *Analysis of Asymptomatic and Presymptomatic Transmission in SARS-CoV-2 Outbreak, Germany, 2020,* 27 Emerging Infectious Diseases 4 (April 2021) available at https://www.cdc.gov/cid/article/27/4/20-4576_article.
[31] *Id.*
[32] *Id.*

proposition that those who are asymptomatic pose a real danger.[33] In the words of Allyson M. Pollock, a professor of public health at Newcastle University in the United Kingdom, "[s]earching for people who are asymptomatic yet infectious is like searching for needles that appear and reappear transiently in haystacks, particularly when rates are falling."[34]

47.     Moreover, according to FDA, there is insufficient data to determine the vaccines authorized for emergency use actually prevent asymptomatic infection or the transmission of SARS-CoV-2, the virus that causes COVID-19.[35]

48.     Recently, the CDC reported that "new scientific data" demonstrated that vaccinated people who experienced breakthrough infections carried similar viral loads to the unvaccinated (but not naturally immune), leading the CDC to infer that vaccinated people transmit the virus at concerning levels.[36]

49.     The Defendants' vaccine mandate "accommodation" – limiting asymptomatic unvaccinated employees from its workplace by effectively terminating them – flies in the face of the current scientific literature, which shows asymptomatic spread of COVID-19 is virtually non-existent.

50.     In sum, little objective evidence exists to support a finding that

---

[33] *See* John Lee, *Asymptomatic spread: who can really spread COVID-19,* Health advisory & Recovery Team (Mar. 2021) available at https://www.hartgroup.org/wp-content/uploads/2021/03/ASYMPTOMATIC-SPREAD.pdf.

[34] Allyson M. Pollock, *Asymptomatic transmission of covid-19,* the BMJ (Dec. 21, 2020) available at https://www.bmj.com/content/371/bmj.m4851.

[35] FDA, *Pfizer-BioNTech COVID-19 Vaccine Frequently Asked Questions,* (Nov. 19, 2020) available at https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/pfizer-biontech-covid-19-vaccine-frequently-asked-questions.

[36] *See CDC reversal on indoor masking prompts experts to ask, "Where's the data?",* WASHINGTON POST (Jul. 28, 2021) available at https://www.washingtonpost.com/health/breakthrough-infections-cdc-data/2021/07/28/dcaaa6b2-efce-11eb-a452-4da5fe48582d_story.html.

asymptomatic spread is a driver of COVID-19 and, therefore, poses a danger to the Defendants' workplaces. Rather, the epidemic spread of COVID-19 is propelled almost exclusively by symptomatic persons (many of whom are fully vaccinated) who can easily self-isolate or quarantine from their co-workers.

51. A reasonable accommodation to vaccination is not to place perfectly healthy workers on unpaid status, and further to ban them from the workplace indefinitely or permanently. The Defendants' vaccine mandates are nonsensical, unjust, and a violation of federal and state law.

52. The government-operated Vaccine Adverse Event Reporting System ("VAERS") database is intended to function as an "early warning" system for potential health risks caused by vaccines. Presently, VAERS is broadcasting a red alert, but the Defendants are refusing to take account this important data of adverse reactions to the vaccines and instead is barreling down the tracks of forced vaccination at full steam.

53. Recent data presents an alarming picture. As of August 5, 2022, there have been 30,162 deaths reported to VAERS from COVID-19 vaccines, compared to just 8,673 for the preceding 30 years for all other vaccines.[37] According to Josh Guetzhow, Ph.D., there are 91 times the number of deaths and 276 times the number of coagulopathy events reported after COVID-19 vaccination than after flue vaccination.[38]

54. Moreover, new research suggests the heightened risk of adverse effects

---

[37] Josh Guetshow, *Safety Signals for COVID Vaccines are Loud and Clear. Why is Nobody Listening?* THE DEFENDER (Sept. 29, 2021) available at https://childrenshealthdefendse.org/defender/safety-signals-covid-vaccines-full-transparency-cdc-fda/.
[38] *Id.*

results from "preexisting immunity to SARS-CoV-2 [that] may trigger intense, albeit relatively rare, inflammatory and thrombotic reactions in previously immunized and predisposed individuals

55. Although the number of VAERS reports is alarming in its own right, it is likely the true number of adverse effects associated with the COVID-19 vaccines far exceeds cases reported to VAERS. In 2010, a federal study commissioned by the U.S. Health and Human Services and performed by Harvard University consultants on behalf of the Agency for Health care Research and Quality ("AHRQ") found that "fewer than 1% of vaccine adverse events" are ever reported to VAERS.[39] Thus, it is likely scores of adverse events associated with the COVID-19 vaccines, including deaths, go unreported.

56. It is not just VAERS that is broadcasting a red alert. On October 1, 2021, the European Union's drug regulator, the European Medicines Agency ("EMA"), identified a new possible link between rare cases of blood clotting in deep veins with Johnson & Johnson's COVID-19 vaccine.[40] The EMA said the new, possibly life-threatening clotting condition known as venous thromboembolism ("VTE") should be included on the Johnson & Johnson product label as a possible side-effect of the shot.[41]

57. What is more, the Moderna and Pfizer vaccines are made with

---

[39] Ross Lazerus, et al. *Electronic Support for Public Health – Vaccine Adverse Event Reporting System (ESP:VAERS),* Agency for Healthcare Research and Quality (Sept. 30, 2010) available at https://digital.ahrq.gov./sites/default/files/docs/publication/r18hs017045-lazarus-final-report-2011.pdf.

[40] Reuters, EU finds J&J COVID shot possibly linked to another rare clotting condition, REUTERS (Oct. 1, 2021) available at https://www.reuters.com/business/healthcare-pharmaceuticals/eu-finds-jj-covid-shot-possibly-linked-another-rare-clotting-condition-2021-10-01/.

[41] *Id.*

polyethylene glycol ("PEG") and Johnson & Johnson uses a similarly problematic ingredient: polysorbate.[42] PEG has been linked to anaphylaxis in numerous recipients of the vaccine. PEG is the delivery mechanism to the cells that keeps the mRNA from dispersing and not reaching its intended target. PEG performs its intended use. Unfortunately, about 70% of the U.S. population is slightly to somewhat allergic to PEG. The National Institute of Health ("NHI") recently began a clinical trial of "systematic allergic reaction to the Moderna or Pfizer-BioNTech COVID-19 vaccines" due to the recipients of those vaccines experiencing anaphylaxis.[43]

58.     According to the CDC, individuals who are allergic to PEG should not take the Moderna or Pfizer vaccines, and those who are allergic to polysorbate should not take the Johnson & Johnson vaccine.[44]

59.     Despite this known risk, the Defendant is not offering PEG allergy testing pre-vaccination and are not offering any indemnity or disability coverage from any of the known and potential adverse effects of the COVID-19 vaccines.

60.     To summarize, the potential adverse effects Plaintiff faced in being coerced to receive the COVID-19 vaccines pursuant to the Defendant's vaccine mandate is not theoretical, hypothetical or academic – they are very real and have real victims. Given the alarming reports of adverse side-effects associated with the COVID-19 vaccines, subjecting

---

[42] CDC, *COVID-19 Vaccines for People with Allergies* (Dec. 14, 2021) available at https://www.cdc.gov/coronavirus/2019-ncov/vaccines/recommendations/specific-groups/allergies.html.

[43] NIH, *NIH begins study of allergic reactions to Moderna, Pfizer-BioNTech COVID-19 vaccines* (Apr. 7, 2021) available at https://www.nih.gov/news-events/news-releases/nih-begins-study-allergic-reactions-moderna-pfizer-biontech-covid-19-vaccines.
[44] *See id.* at note 43.

Plaintiff to vaccination exposes them to a variety of health risks ranging from headaches and blood clots to death.

**The Defendant improperly refused to grant the Plaintiff's religious exemption in violation of Title VII and O.R.C. § 4112.12**

A. The Defendant's improper conduct regarding the vaccine mandate policy and procedures and its communications with the Plaintiff regarding her request for a religious exemption.

61. On August 5, 2021 the Defendant announced that it would require, as a condition of employment, all employees to receive a COVID-19 vaccination. *See* Exhibit A.

62. The Defendant's website states: "Dayton Children's Hospital requires the COVID-19 vaccination as a condition for employment as we do for many other infectious diseases. This decision was announced August 5, 2021." (attached hereto as Exhibit E), Dayton Children's Hospital, Careers, FAQS, available at https://www.childrensdayton.org/careers/frequently-asked-questions, retrieved August 16, 2022.The website does not address, at all, the procedures for seeking a religious exemption from the mandate. Interesting the same site states that employees and volunteers may be exempt from the influenza vaccine condition of employment if "there is a documented and legitimate reason not to" receive that vaccination. *Id.*

63. On August 15, 2021, the Plaintiff completed the COVID-19 religious exemption form provided by the Defendant, which stated:

> A religious exemption to COVID-19 immunization may be granted based on an individual's sincerely held religious belief, practice or observation that prohibits vaccination. In this analysis, "religious belief, practice, or observance" includes moral or ethical belief as to what is right and wrong which are sincerely held with the strength of traditional religious views. **Social, political, or economic philosophies, as well as personal preference, do not constitute sincerely held religious beliefs.**

19

In the space provided below, please provide a statement describing your sincerely held religious belief, practice, or observance and how the COVID-19 vaccination will violate this belief. Your statement should explain your religious belief, establish that it is sincerely held, and explain in what ways receiving the COVID-19 vaccination conflicts with your religious belief. You may attach any documents that support your statement.

*See* Exhibit B (emphasis in the original).

64. The Plaintiff attached the following statement:

Breathe: God breathes life into humanity: Breathing is a very powerful biblical image. In Genesis God creates humanity from the clay of the earth. Yet the human being is merely a lifeless work of clay pottery until God breathes into the nostrils of the human. It is that first breath that gives us life.
Genesis 2:7
And the LORD God formed man of the dust of the ground, and breathed into his nostrils the breath of life; and man became a living being.
2 Timothy 3:16
All scripture is given by inspiration of God, and is profitable for doctrine, for reproof, for correction, for instruction in righteousness:
John 1:1
In the beginning was the Word, and the Word was with God, and the Word was God. John 3:16
For God so loved the world, that he gave his only begotten Son, that whosoever believeth in him should not perish, but have everlasting life.
John 10:10
The thief does not come except to steal, and to kill, and to destroy. I have come that they may have life, and that they may have it more abundantly.
Proverbs 3:5-8
Trust in the LORD with all your heart, and do not lean on your own understanding. In all your ways acknowledge Him, and He will make straight your paths. Be not wise in thine own eyes: fear the Lord, and depart from evil. It shall be health to thy navel and marrow to thy bones. Psalm 23:1-6
The LORD is my shepherd; I shall not want. He maketh me to lie down in green pastures: he leadeth me beside the still waters. He restoreth my soul: he leadeth me in the paths of righteousness for his name's sake, Yea, though I walk through the valley of the shadow of death, I will fear no evil: for thou art with me; thy rod and thy staff they comfort me. Thou preparest a table before me in the presence of mine enemies: Thou anoint my head with oil; my cup runneth over. Surely

20

goodness and mercy shall follow me all the days of my life: and I will dwell in the house of the LORD forever.

Psalm 91 :1-16

He that dwelleth in the secret place of the most High shall abide under the shadow of the Almighty. I will say of the LORD, He is my refuge and my fortress: my God; in him will I trust. Surely, he shall deliver thee from the snare of the fowler, and from the noisome pestilence. He shall cover thee with his feathers, and under his wings shalt thou trust: his truth shall be thy shield and buckler. Thou shalt not be afraid for the terror by night; nor for the arrow that flieth by day; Nor for the pestilence that walketh in darkness; nor for the destruction that wasteth at noonday. A thousand shall fall at thy side, and ten thousand at thy right hand; but it shall not come nigh thee. Only with thine eyes shalt thou behold and see the reward of the wicked. Because thou hast made the LORD, which is my refuge, even the most High, thy habitation; There shall no evil befall thee, neither shall any plague come nigh thy dwelling. For he shall give his angels charge over thee, to keep thee in all thy ways, They shall bear thee up in their handsy lest thou dash thy foot against a stone. Thou shalt tread upon the lion and adder: the young lion and the dragon shalt thou trample under feet. Because he hath set his love upon me/ therefore will I deliver him: I will set him on high, because he hath known my name. He shall call upon me, and I will answer him: I will be with him in trouble; I will deliver him, and honor him. With long life will I satisfy him and shew him my salvation.

My walk with the Lord is a personal and sincere journey that is an ongoing adventure. His word says that He knew me in my mother's womb. I praise Him for I am fearfully and wonderfully made Psalm 139:13-14. My relationship with God is based off my personal encounters and experience over the years as He has guided me.

I do not place my trust in man or expectations in a vaccine to save me or this world. I refuse to be bullied, manipulated, coerced, threatened, intimidated or bribed into receiving a vaccine that should never be forced or mandated upon an individual, God sent His son, Jesus Christ into the world to set the captive free, We have freedom through what He did for us on the cross. He is my Savior, Provider, Rock, and Deliverer. In God I trust and put my faith.

I reflect back to when employees were furloughed and fear was thick in the atmosphere. I felt as though I would be smothered by it. I wanted to walk away from my job but I prayed about it and God gave me this message..." Your emotions are fickle and fleeting don't make decisions based on a feeling; this too shall pass", I prayed and stayed.

I will not defile myself by taking the vaccine. God has clearly spoken to my spirit "Ella Mae you do not need to fear the delta variant; you have the Alpha and Omega variant running through your veins. Fear not!"

If my religious exemption is denied and I am forced out of this nest of 26 years then I will fly into the next chapter of my life. This

next season is waiting and yet to be seen but I am confident the best is yet to come. His grace is sufficient enough for me.

What I've learned through this pandemic is that God stopped the world to love on us. During the shut down I joined a ministry called GWG and learned how to play guitar. I experienced a spiritual growth spurt as I spent quality time reading God's Word, praying, and worshiping my Lord and Savior every day. If fear attempts to creep in I am overwhelmed by a supernatural peace, I trust that God will supply my every need as I continue to seek His face. I will listen to and obey my compelling convictions and decline the vaccine

2 Corinthians 3:17
Now the Lord is the Spirit; and where the Spirit of the Lord is, there is liberty.

Romans 8:28
And we know that all things work together for good to those who love Godl to those who are the called according to His purpose.

Matthew 6:9-13
In this manner, therefore, pray: Our Father in heaven, Hallowed be Your Name. Your kingdom come, Your will be done on earth as it is in heaven. Give us this day our daily bread and forgive us our debts as we forgive our debtors, And do not lead us into temptation, but deliver us from the evil one. For Yours is the kingdom and power and glory forever, Amen.


Respectfully Submitted,


Ella Mae Hix



Plaintiff signed the form, attesting that "[b]y signing my name, I attest that my statement above is true and accurate and that I hold a sincere religious belief that prohibits COVID-19 vaccination." The form also *required* the signature of the Plaintiff's Religious Clergy or Pastor; Plaintiff's form was signed by her Pastor. *Id.* Such requirement of the Clergy or Pastor's signature is a further example of the Defendant's trampling of Ms. Hix's religious rights as the EEOC defines sincerely held religious

beliefs very broadly and an official of any religion should not be required to justify an employee's sincerely held religious beliefs. The EEOC in their on-line guidance document titled: *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws ("EEOC COVID-19 Guidance")*, states:

> [T]he definition of religion is broad and protects beliefs, practices, and observances with which the employer may be unfamiliar. Therefore, the employer should ordinarily assume that an employee's request for religious accommodation is based on a sincerely held religious belief, practice, or observance. However, if an employee requests a religious accommodation, and an employer is aware of facts that provide an objective basis for questioning either the religious nature or the sincerity of a particular belief, practice, or observance, the employer would be justified in requesting additional supporting information.
> *See* EEOC COVID-19 Guidance K.12

In the case at hand, Ms. Hix's religious exemption request was denied via an undefined and unsupported validity test concocted by the Defendants without the required objective basis support.

65. On November 1, 2021, the Plaintiff received a letter, the subject of which was "**Exemption denied**," from the Defendant. *See* Ex. C (emphasis in the original). The letter stated:

> A diverse group of physician and non-physician experts who have significant expertise in this area reviewed your request. After a thorough review of your request, your COVID-19 vaccine exemption request **has not been approved**. Your request is not accepted as a valid basis for exemption from the Dayton Children's vaccine requirement.
>
> If by December 1, 2021, you have no submitted proof of vaccination to employee health, you will be placed on a leave of absence for 30 days. To remain employed by Dayton Children's Hospital, you need to complete a full course of the vaccine and submit proof of vaccination and submit proof of vaccination to employee health **by December 31, 2021.**
>
> **Can I appeal the committee's decision if I'm denied?**

23

The committee thoroughly review your application and evaluated it consulting with evidence-based research on accepted exclusion criteria. Therefore, they have the final decision on the exemption.

66. The letter also stated: "If you have any questions, please contact employee health at eh@childrensdayton.org." *Id.* The Plaintiff emailed the address to ask for clarification as to how her exemption request failed to meet the Defendant's requirements. Upon information and belief, the Defendant refused to answer the Plaintiff's request.

67. The Plaintiff was terminated on **November 30**, 2021 because her religious exemption request was illegally denied despite the fact that this violated the Defendant's own policy as stated in the Defendant's November 1, 2021, letter. Ms. Hix attempted multiple times to have Defendant's provide her the criteria used to determine her religious exemption request was "not accepted as a valid basis for exemption from the Dayton Children's vaccine requirement." However, her legitimate questions were never addressed nor even responded to. Therefore, no review of the Defendant's conduct in evaluating the request was ever established.

68. Upon information and belief, the Defendant never planned to follow federal or state law requirements, discussed *infra*, that reasonable accommodations must be made for the religious observances of its employees, short of undue hardship. The Defendant's website clearly states that employees may receive an exemption to it's condition of employment requiring an influenza vaccination if "there is a documented and legitimate reason," but no such *legally required* exemption is provided for the COVID-19 vaccination mandate.

69. Upon information and belief, the Defendant denied all requests for religious accommodations.

70. Plaintiff objects to receiving the COVID-19 vaccine because she is a

24

Christian, her body is the temple of the Holy Spirit and, as a Christian, she is compelled to protect her body from defilement. Insofar as the COVID-19 vaccines also contain neurotoxins, hazardous substances, attenuated virus, animal parts, foreign DNA, albumin from human blood, carcinogens and chemical wastes that a proven harmful to the human body, the Plaintiff finds the taking of the vaccine to be in direct conflict with her Christian duty to protect her body as the temple of the Holy Spirit.

B. Federal law and State law prohibiting religious discrimination.

71.     Title VII prohibits the Defendant from discriminating against employees based on their religion. This "include[s] all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

72.     Title VII "imposes upon employers a 'statutory obligation to make reasonable accommodation for the religious observances of its employees, short of undue hardship." *Reed v. International Union, United Automobile, Aerospace and Agricultural Implement w\Workers of America*, 569 F.3d 576, 579 (6th Cir. 2009).

73.     A prima facie case of religious discrimination based on a failure to accommodate requires a plaintiff to show "(1) a bona fide religious practice conflicts with an employment requirement, (2) he or she brought the practice to the [defendant's] attention, and (3) the religious practice was the basis for the adverse employment decision." *E.E.O.C. v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rica*, 279 F.3d 49, 55 (1st Cir. 2002). *See also Reed,* 569 F. 3d at 579 (6th Cir. 2009); *Smith v. Pyro Mining Co.,* 827 F.2d 1081 (6th Cir. 1987) A "bona fide religious practice" or belief is one that is "religious and

25

sincerely held." *Id.* Title VII's definition of religion includes "all aspects of religious observance and practice, as well as belief." *Id.,* citing 42 U.S.C. § 2000e(j). Further 29 C.F.R. § 1605.1 states that religious practices include "moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious values." Section 2000e(j) "leaves little room for a party to challenge the religious nature of an employee's professed beliefs." *Union Independiente*. Religious beliefs are not required to be "acceptable, logical, consistent, or comprehensible to others," and that interfaith differences as to what is scripturally acceptable are "not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences." *Id.*

74. Once an employee has made out a prima facie case of discrimination, the employer must show that it offered a reasonable accommodation, or that reasonable accommodation would be an undue burden. *Stanley v. Lawson Co.,* 993 F. Supp. 1084 (N.D. Ohio 1997).

75. "An employer must . . . present evidence of undue hardship" and not "rely merely on speculation," *Smith v. Pyro Min. Co.,* 827 F.2d 1081, 1085-86 (6th Cir. 1987), and the lack of substantive content in the Defendant's justification here demonstrates that the Defendant cannot show undue hardship.

76. Merely stating that there is increased risk to the workplace and employee safety without explaining why and without providing evidentiary support cannot be sufficient to meet the Defendant's obligation under Title VII to establish undue hardship. Establishing "undue hardship" requires assessment of actual circumstances at the employer's place of business and of proposed and potential accommodations, and the Defendant's rote

26

justification demonstrates that the Defendant did not do the work of assessing undue hardship. *See id.*

77. Undue hardship analysis must start with an analysis of proposed accommodations. The Defendant did not identify potential accommodations. Therefore, the Defendant did not reach the first step of analyzing accommodations. An employer violates Title VII if it fails to attempt as accommodation after accommodation is requested. *EEOC v. Arlington Transit Mix, Inc.,* 957 F.2d 219, 222 (6th Cir. 1991) ("[a]fter failing to pursue [a voluntary waiver of seniority rights] or any other reasonable accommodation, the company is in no position to argue that is was unable to accommodate reasonably [plaintiff's] religious needs without undue hardship."); *EEOC v. Ithaca Indus., Inc.,* 849 F.2d 116 (4th Cir. 1988) *cert denied* 488 U.S. 924 (1988) (same).

78. An employer must demonstrate attempted accommodation before it claims undue hardship as a defense. *See, e.g., Redmond v. GAF Corp.,* 574 F.2d 897, 901-02 (7th Cir. 1978); *Shaffeld v. Northrop Worldwide Aircraft Serv., Inc.,* 373 F. Supp. 937, 944 (M.D. Ala. 1974). The Defendant's' justification for denying the Plaintiff's requests for religious exemptions demonstrates that it did not consider potential accommodations.

79. Moreover, the Defendant clearly could have considered accommodations as dictated by the EEOC. In the EEOC COVID-19 Guidance, the guidelines provide "examples of reasonable accommodations or modifications that employers may have to provide to employees who do not get vaccinated due to disability; religious beliefs, practices, or observance; or pregnancy." Reasonable accommodations the EEOC has identified as potentially not imposing an undue hardship on the employer include requiring the unvaccinated employee entering the workplace to:

27

(1) wear a face mask,

(2) work at a social distance,

(3) work a modified shift.

(4) get periodic tests for COVID-19,

(5) be given the opportunity to telework, or

(6) accept a reassignment.

*See* EEOC COVID-19 Guidance, K.2. The Plaintiff would have willingly complied with any of these accommodations.

80. Beginning in March 2020, the Defendant had the opportunity to test many relevant accommodations for its employees, including daily assessments of personal health and potential exposure, availability of targeted COVID-19 testing, protocols requiring non-work when symptomatic or potentially exposed to COVID-19, contact tracing, handwashing and hygiene, and the use of PPE.

81. Such accommodations are understood to have prevented any substantial or material transmission of COVID-19 when used.

82. In addition, other accommodations are potentially available. For instance, the EEOC has specifically identified testing of employees before they enter the workplace. The *EEOC COVID-19 Guidance* states, "an employer may choose to administer COVID-19 testing to employees before initially permitting them to enter the workplace and/or periodically to determine if their presence in the workplace poses a direct threat to others." *EEOC COVID-19 Guidance*, A.6.

83. The Defendant's vaccine mandate provided employees, in theory but not in practice, the illusory ability to obtain a religious exemption from the vaccine mandate.

28

84. The Defendant denied the Plaintiff's request for religious accommodation with the following generic reply: "A diverse group of physician and non-physician experts who have significant expertise in this area reviewed your request. After thorough review of your request, your COVID-19 vaccine request **has not been approved**. Your request is not accepted as a valid basis for exemption from the Dayton Children's vaccine requirement." *See* Ex. C (emphasis in the original).

85. The Defendant never told the Plaintiff how she had failed to demonstrate her beliefs were not sincerely held.

86. The Defendant made no attempt to accommodate the Plaintiff's request for religious exemption, despite the fact that she was willing to comply with other safety precautions.

87. The Defendant made no showing, nor ever even attempted to claim, that providing the Plaintiff the requested exemption was an undue burden.

88. The Defendant did not engage the Plaintiff in a give and take discussion about potential accommodations. Plaintiff's willingness to comply with other safety measures were ignored.

89. It is well established that Title VII and O.R.C. § 4112 "have the same evidentiary standards and general analysis." *Gibbons v. Bair Foundation*, No. 1:04CV2018, 2007 WL 582314, at *4-5 (N.D. Ohio Feb. 20, 2007) citing *Greene v. St. Elizabeth Hosp. Med. Ctr.*, 134 F.3d 371, 1998 WL 13410, at *5 (6th Cir. 1998).

90. Given these facts, the Defendant's vaccination policy is vastly overreaching and unnecessarily violated federal and state law.

## COUNTS

### COUNT ONE

**Violation of Title VII, 42 U.S.C. § 2000e, *et seq.***
**Religious Discrimination-Failure to Accommodate**

91.    Plaintiff restates the foregoing paragraphs as if set forth fully herein.

92.    At all times relevant, Plaintiff was Defendant's "employee" within the meaning of 42 U.S.C. § 2000e(f).

93.    At all times relevant, the Defendant was Plaintiff's "employer" within the meaning of 42 U.S.C. § 2000e(b).

94.    Plaintiff holds sincere religious beliefs that preclude her from receiving a COVID-19 vaccine.

95.    Plaintiff informed her employer, the Defendant, of those beliefs and requested religious accommodations from the Defendant's vaccine mandate.

96.    The Defendant refused to engage in a meaningful interactive process with the Plaintiff regarding her religious accommodation request and instead only responded to Plaintiff with questions designed to challenge the sincerity of Plaintiff's religious beliefs. The Defendant failed to provide the Plaintiff with reasonable accommodations for her religious belief, instead terminating her for failing to violate her sincerely held beliefs and obtain a vaccination.

97.    The Defendant thereby discriminated again the Plaintiff because of her religious beliefs.

98.    By failing to engage in the interactive process or offer any reasonable accommodation, the Defendant's discriminatory actions were intentional and/or reckless and in violation of Title VII.

99. It is reasonable to infer from the totality of the circumstances that Defendant did not bother engaging in an interactive process with those seeking religious exemptions because the Defendant intended to discriminate against those seeking religious exemptions and never intended to provide them with a reasonable accommodation.

100. The Defendant illegally and improperly did not identify potential accommodations as required by state and Federal law. The Defendant cannot assert the defense of undue hardship because it did not assert or show undue hardship in declining to accommodate the Plaintiff's sincerely held religious beliefs and no undue burden exists here regardless.

101. By discriminating against Plaintiff, because of her sincerely held religious beliefs, in their decision to deny Plaintiff's legitimate religious exemption, the Defendant violated Title VII. And this violation has harmed and continues to harm Plaintiff.

102. Due to the Defendant's improper and willful, intentional and unlawful actions and the subsequent harm suffered by the Plaintiff, the Plaintiff asks the Court for the relief requested in her Prayer for Relief.

## COUNT TWO

### Violation of O.R.C. § 4112, *et seq.*,
### Religious Discrimination-Failure to Accommodate

103. Plaintiff restates the foregoing paragraphs as if set forth fully herein.

104. Plaintiff holds sincere religious beliefs that preclude her from receiving a COVID-19 vaccine.

105. Plaintiff informed her employer, the Defendant, of those beliefs and requested religious accommodations from the Defendant's vaccine mandate.

106. The Defendant refused to engage in a meaningful interactive process

31

with the Plaintiff regarding her religious accommodation request and instead only responded to Plaintiff with questions designed to challenge the sincerity of Plaintiff's religious beliefs. The Defendant failed to provide the Plaintiff with reasonable accommodations for her religious belief, instead terminating her for failing to violate her sincerely held beliefs and obtain a vaccination.

107. The Defendant thereby discriminated again the Plaintiff because of her religious beliefs.

108. By failing to engage in the interactive processor offer any reasonable accommodation, the Defendant's discriminatory actions were intentional and/or reckless and in violation of O.R.C. § 4112, *et seq.*

109. It is reasonable to infer from the totality of the circumstances that Defendant did not bother engaging in an interactive process with those seeking religious exemptions because the Defendant intended to discriminate against those seeking religious exemptions and never intended to provide them with a reasonable accommodation.

110. The Defendant illegally and improperly did not identify potential accommodations as required by state and Federal law. The Defendant cannot assert the defense of undue hardship because it did not assert or show undue hardship in declining to accommodate the Plaintiff's sincerely held religious beliefs and no undue burden exists here regardless.

111. By discriminating against Plaintiff, because of her sincerely held religious beliefs, in their decision to deny Plaintiff's legitimate religious exemption, the Defendant violated O.R.C. § 4112, *et seq.* And this violation has harmed and continues to harm Plaintiff.

112. Due to the Defendant's improper and willful, intentional and unlawful

32

Actions, conducted with malice and aggregated and egregious fraud, and the subsequent harm suffered by the Plaintiff, the Plaintiff asks the Court for the relief requested in her Prayer for Relief.

## PRAYER FOR RELIEF

For the foregoing reasons, Plaintiff respectfully requests that the Court grant the following relief:

    A. Payment for all economic damages, including, but not limited to, back pay, front pay and benefit in amounts to be determined at trial;

    B. Compensatory and consequential damages, and all non-economic damages, including for emotional duress;

    C. Punitive damages;

    D. Statutory damages;

    E. Pre-judgment and post-judgment interest at the highest lawful rate;

    F. An award of reasonable attorneys' fees, costs and expenses of all litigation to the extent allowable under federal and state law;

    G. Trial by jury on all triable issues; and

    H. Such other relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted,

/s/Glenn Feagan
Glenn Feagan (Bar No. 041520)

33

Deters Law
5247 Madison Pike
Independence, KY 41051
Phone. (859) 363-1900
gfeagan@feaganlaw.com

**EXHIBIT A**

dayton children's

home // the hub // news // news and blog // to keep children safe, dayton children's requires covid-19 vaccine for all employees

8/5/21     news article

# to keep children safe, Dayton Children's requires COVID-19 vaccine for all employees

At the urging of the Children's Hospital Association, the American Hospital Association, the American Academy of Pediatrics and the American Nurses Association, Dayton Children's will require the COVID-19 vaccine for staff, volunteers, students and onsite contractors. This decision is made with a great deal of research, analysis and discussion, putting the safety of our children at the forefront.

Even though children are less likely to become seriously ill from COVID-19 infections, they have suffered. More than four million children have been diagnosed with COVID to date. Some have even developed MIS-C, in which their organs and even their skin becomes inflamed. They need long-term follow up to ensure they recover, especially from heart issues.

Even those children who have not gotten sick have suffered. Pandemic-related isolation, fear and loss exacerbated mental and behavioral health conditions. Children who most needed academic support could not go to school. Learning all but ground to a halt. Support services through the school were severely limited.

Children have lost parents to this virus. They have had to say goodbye to grandparents, aunts and uncles. They will never see some teachers or some neighbors again because of this virus.

We had hope with a vaccine. We took off our masks. We returned to school. We started traveling, meeting with friends and families, and shopping again.

Then we stopped halfway to the goal line. Ohio is only 50% vaccinated. The virus took that opening and ran with it, mutating into the highly contagious delta variant. What we are seeing today is a virus

dayton children's

Over the past 18 months, America's children's hospitals and their dedicated teams have worked heroically to do their part during the pandemic. With the recent surge in COVID cases across the country, we must go further to protect our nation's children. They cannot protect themselves. We must do it for them.

While we respect differences of opinion, the science overwhelmingly shows the best available protection is the vaccine. We will also continue to wear masks, practice hand hygiene and social distance as added layers of protection.

At Dayton Children's, we are honored and humbled by the trust parents place in us to care for their children. We must do all we can to protect them.

**EXHIBIT B**

# COVID-19 religious exemption form

Printed Name: Ella M Hix          Address: 7513 Harshmanville Rd
Date: 8/15/21                              Huber Heights, OH 45424

A religious exemption to COVID-19 immunization may be granted based on an individual's sincerely held religious belief, practice or observance that prohibits COVID-19 vaccination. In this analysis, "religious belief, practice, or observance" includes moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views. **Social, political, or economic philosophies, as well as personal preferences, do not constitute sincerely held religious beliefs.**

In the space provided below, please provide a statement describing your sincerely held religious belief, practice, or observance and how the COVID-19 vaccination will violate this belief. Your statement should explain your religious belief, establish that it is sincerely held, and explain in what ways receiving the COVID-19 vaccination conflicts with your religious belief. You may attach any documents that support your statement.

**Important: exemption requests are required to be approved.**

Exemption Statement: (Add Attachment for Additional Information as needed)

By signing my name, I attest that my statement above is true and accurate and that I hold a sincere religious belief that prohibits COVID-19 vaccination.

Employee Name: Ella M. Hix
Print Name: Ella M Hix
Religious Clergy/Pastor Signature: Kimble Zorne   PASTOR

**EXEMPTION COMMITTEE REVIEW**
☐ Approved          ☐ Denial Date ____/___/____

Breathe: **God breathes life into humanity**: Breathing is a very powerful biblical image. In Genesis God creates humanity from the clay of the earth. Yet the human being is merely a lifeless work of clay pottery until God breathes into the nostrils of the human. It is that first breath that gives us life.

### Genesis 2:7

And the LORD God formed man *of* the dust of the ground, and breathed into his nostrils the breath of life; and man became a living being.

### 2 Timothy 3:16

All scripture is given by inspiration of God, and is profitable for doctrine, for reproof, for correction, for instruction in righteousness:

### John 1:1

In the beginning was the Word, and the Word was with God, and the Word was God.

### John 3:16

For God so loved the world, that he gave his only begotten Son, that whosoever believeth in him should not perish, but have everlasting life.

### John 10:10

The thief does not come except to steal, and to kill, and to destroy. I have come that they may have life, and that they may have *it* more abundantly.

### Proverbs 3:5-8

Trust in the LORD with all your heart, and do not lean on your own understanding. In all your ways acknowledge Him, and He will make straight your paths. Be not wise in thine own eyes: fear the Lord, and depart from evil. It shall be health to thy navel and marrow to thy bones.

### Psalm 23:1-6

The LORD is my shepherd; I shall not want. He maketh me to lie down in green pastures: he leadeth me beside the still waters. He restoreth my soul: he leadeth me in the paths of righteousness for his name's sake. Yea, though I walk through the valley of the shadow of death, I will fear no evil: for thou art with me; thy rod and thy staff they comfort me. Thou preparest a table before me in the presence of mine enemies: Thou anoint my head with oil; my cup runneth over. Surely goodness and mercy shall follow me all the days of my life: and I will dwell in the house of the LORD forever.

### Psalm 91:1-16

He that dwelleth in the secret place of the most High shall abide under the shadow of the Almighty. I will say of the LORD, He is my refuge and my fortress: my God; in him will I trust. Surely, he shall deliver thee from the snare of the fowler, and from the noisome pestilence. He shall cover thee with his feathers, and under his wings shalt thou trust: his truth shall be thy shield and buckler. Thou shalt not be afraid for the terror by night; nor for the arrow that flieth by day; Nor for the pestilence that walketh in darkness; nor for the destruction that wasteth at noonday. A thousand shall fall at thy side, and ten thousand at thy right hand; but it shall not come nigh thee. Only with thine eyes shalt thou behold and see the reward of the wicked. Because thou hast made the LORD, which is my refuge, even the most High, thy habitation; There shall no evil befall thee, neither shall any plague come nigh thy dwelling. For he shall give his angels charge over thee, to keep thee in all thy ways. They shall bear thee up in their hands, lest thou dash thy foot against a stone. Thou shalt tread upon the lion and adder: the young lion and the dragon shalt thou trample under feet. Because he hath set his love upon me, therefore will I deliver him: I will set him on high, because he hath known my name. He shall call upon me, and I will answer him: I will be with him in trouble; I will deliver him, and honor him. With long life will I satisfy him and shew him my salvation.

My walk with the Lord is a personal and sincere journey that is an ongoing adventure. His word says that He knew me in my mother's womb. I praise Him for I am fearfully and wonderfully made Psalm 139:13-14. My relationship with God is based off my personal encounters and experience over the years as He has guided me.

I do not place my trust in man or expectations in a vaccine to save me or this world. I refuse to be bullied, manipulated, coerced, threatened, intimidated or bribed into receiving a vaccine that should never be forced or mandated upon an individual. God sent His son, Jesus Christ into the world to set the captive free. We have freedom through what He did for us on the cross. He is my Savior, Provider, Rock, and Deliverer. In God I trust and put my faith.

I reflect back to when employees were furloughed and fear was thick in the atmosphere. I felt as though I would be smothered by it. I wanted to walk away from my job but I prayed about it and God gave me this message…" Your emotions are fickle and fleeting don't make decisions based on a feeling; this too shall pass". I prayed and stayed.

I will not defile myself by taking the vaccine. God has clearly spoken to my spirit "Ella Mae you do not need to fear the delta variant; you have the Alpha and Omega variant running through your veins. Fear not!"

If my religious exemption is denied and I am forced out of this nest of 26 years then I will fly into the next chapter of my life. This next season is waiting and yet to be seen but I am confident the best is yet to come. His grace is sufficient enough for me.

What I've learned through this pandemic is that God stopped the world to love on us. During the shut down I joined a ministry called GWG and learned how to play guitar. I experienced a spiritual growth spurt as I spent quality time reading God's Word, praying, and worshiping my Lord and Savior every day. If fear attempts to creep in I am overwhelmed by a supernatural peace. I trust that God will supply my every need as I continue to seek His face. I will listen to and obey my compelling convictions and decline the vaccine.

### 2 Corinthians 3:17
Now the Lord is the Spirit; and where the Spirit of the Lord *is*, there *is* liberty.

### Romans 8:28
And we know that all things work together for good to those who love God, to those who are the called according to *His* purpose.

### Matthew 6:9-13
In this manner, therefore, pray: Our Father in heaven, Hallowed be Your Name. Your kingdom come, Your will be done on earth as it is in heaven. Give us this day our daily bread and forgive us our debts as we forgive our debtors. And do not lead us into temptation, but deliver us from the evil one. For Yours is the kingdom and power and glory forever, Amen.

Respectfully Submitted,

Ella Mae Hix

**EXHIBIT C**

**EXHIBIT C**



November 1, 2021

Ella Hix
Patient Access Specialist

**Exemption denied**

Dear Ella,

We received your form requesting exemption from Dayton Children's COVID-19 vaccine requirement. This policy was effective on August 5, 2021, as a condition of employment at Dayton Children's Hospital.

A diverse group of physician and non-physician experts who have significant expertise in this area reviewed your request. After thorough review of your request, your COVID-19 vaccine exemption request **has not been approved.** Your request is not accepted as a valid basis for exemption from the Dayton Children's vaccine requirement.

If by December 1, 2021, you have not submitted proof of vaccination to employee health, you will be placed on a leave of absence for 30 days. To remain employed by Dayton Children's Hospital, you need to complete a full course of the vaccine and submit proof of vaccination to employee health **by December 31, 2021.**

**Can I appeal the committee's decision if I'm denied?**
The committee thoroughly reviewed your application and evaluated it consulting with evidence-based research on accepted exclusion criteria. Therefore, they have the final decision on the exemption.

If you have any questions, please contact employee health at eh@childrensdayton.org.

Employee Health and Wellness

**Dayton Children's Hospital**
One Children's Plaza
Dayton, Ohio 45404-1815
P: 937-641-4570

**EXHIBIT D**

38

EEOC Form 161-B (01/2022)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| | |
|---|---|
| To: **Ella Mae Hix**<br>**7513 Harshmanville Road**<br>**Huber Heights, OH 45424** | From: **Indianapolis District Office**<br>**101 West Ohio St., Suite 1900**<br>**Indianapolis, IN 46204** |

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **22A-2022-01266** | **Jeremy Sells,**<br>**State, Local & Tribal Coordinator** | **(463) 999-1161** |

*(See also the additional information enclosed with this form.)*

### NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

> Less than 180 days have elapsed since the filing date. I certify that the Commission's processing of this charge will not be completed within 180 days from the filing date.

> The EEOC is terminating its processing of this charge.

*Equal Pay Act (EPA): You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.***

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Digitally Signed By: Michelle Eisele 05/20/2022

**Michelle Eisele**
**District Director**

Enclosures(s)

cc:

**HR Director**
**Dayton Children's Hospital**
**ONE CHILDRENS PLAZA**
**DAYTON, OH 45404**

**EXHIBIT E**

39

Once a candidate makes it through the HR and hiring manager interviews they will be asked to participate in a peer interview. This will give the candidate a chance to meet with a select group of peers that they would be working with on a day-to-day basis.

# the hiring process

## how soon should I expect to hear from someone after my interview?

This varies based upon the number of applicants for a position and the number of interviews being conducted. Typically you will hear from us within a week but sometimes it will be anywhere from two to four weeks.

## are there any health requirements to work at Dayton Children's?

All prospective employees will need to complete a physical exam with employee health before beginning to work at Dayton Children's. You will need to provide your immunization records and undergo drug testing. To best protect the children we care for, the annual Influenza immunization is mandatory for those working at Dayton Children's. All employees and volunteers must be vaccinated unless there is a documented and legitimate reason not to do so. During the influenza vaccination season, this is done as part of the pre-placement physical before beginning work and then on an annual basis throughout employment with Dayton Children's Hospital.

Dayton Children's Hospital requires the COVID-19 vaccinate as a condition for employment as we do for many other infectious diseases. This decision was announced August 5, 2021.